IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID E. KIMMEL, *et al*,

          *Plaintiffs*,

v.

ELDERTON STATE BANK, *et al*,

          *Defendants*.

Civil Action No. 2:20-cv-954

Hon. William S. Stickman IV

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, District Judge

The United States of America ("United States") filed a Motion for Substitution of Party (ECF No. 18), together with an accompanying Brief in Support requesting that the Court substitute it in place of Defendant, Charles Glasser ("Glasser"), with regard to Count IV of the Amended Complaint, (ECF No. 13). The United States also filed a Motion to Dismiss the Amended Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 20). Defendant, Elderton State Bank ("the Bank"), filed a Motion to Dismiss (ECF No. 15) the Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 15).

For the reasons that follow, the Court grants the United States' Motion for Substitution of Party (ECF No. 18) and grants the United States' Motion to Dismiss (ECF No. 20) Counts III and IV of the Amended Complaint against Defendants Farm Service Agency ("the Agency"), David Poorbaugh ("Poorbaugh"), and Glasser. The Court denies the Bank's Motion to Dismiss (ECF

1

No. 15) as moot and remands this case to the Court of Common Pleas of Indiana County, Pennsylvania, because it lacks subject matter jurisdiction to adjudicate the remaining claims premised on Pennsylvania state law.

## I.     BACKGROUND

Plaintiffs David Kimmel, Michael Kimmel, and Kimmel Brothers Farms, LLC ("the Farm"), brought suit against the Bank, the Agency, Poorbaugh, and Glasser, alleging various violations of state and federal law.  Plaintiffs allege that the Bank violated Pennsylvania state law by asserting a breach of contract, breach of the duty of good faith and fair dealing, and promissory estoppel.  (ECF No. 13, ¶¶ 77–90).  Plaintiffs allege that the Agency and Poorbaugh violated the Credit Repair Organizations Act, and that Glasser intentionally interfered with a contractual relationship.  (ECF No. 13, ¶¶ 91–104).

David and Michael Kimmel are Pennsylvania residents, and each has a one-half ownership interest in the Farm.  (ECF No. 13, ¶¶ 1–3).  The Farm originally operated as a dairy farm, with approximately 100 cows and cash grain farming spanning approximately 1200 acres.  (ECF No. 13, ¶¶ 10–12).  Because the Farm lacked an adequate drying system and grain storage, and because the Farm's bulk tank and milking equipment needed an upgrade, the Farm planned to expand its operation.  (ECF No. 13, ¶¶ 12–13).  The planned expansion was to include a new barn, water beds, fans, ventilation, and a bulk milk tank.  (ECF No. 13, ¶ 14).  The Farm also purchased an additional 100 heads of dairy cattle.  (ECF No. 13, ¶ 15).

To finance the expansion, the Kimmel Brothers obtained a loan from the Bank that was guaranteed by the Agency.  (ECF No. 13, ¶ 16).  Plaintiffs allege that the Bank has substantial experience with farm loans, particularly with dairy farm loans.  (ECF No. 13, ¶ 17).  Plaintiffs allege that part of that experience includes knowledge of several conditions commonly affecting

dairy farms, including weather conditions and fluctuations in milk pricing. (ECF No. 13, ¶ 18). On April 28, 2015, the Kimmel Brothers received a loan guaranteed by the Agency of $330,000 from the Bank for the expansion of the Farm. (ECF No. 13, ¶ 20). The loan was approved by Ray Sleppy, and to an unknown extent, Poorbaugh, with 90% of the loan being guaranteed by the Agency. (ECF No. 13, ¶¶ 21–23). On May 15, 2015, the second phase of the loan was distributed in the amount of $251,500. (ECF No. 13, ¶ 24).

In 2015, milk prices dropped nationwide resulting in reduced income from the Farm. (ECF No. 13, ¶ 25). Poor weather conditions also resulted in untillable soil, limiting Plaintiffs' ability to plant crops. (ECF No. 13, ¶¶ 26–27). As a result of these external factors, the Kimmel Brothers contacted the Bank to discuss restructuring their loan. (ECF No. 13, ¶ 30). Ray Sleppy informed them that the Agency had troubles guaranteeing "old loans," and that the Agency had an issue regarding collateral adjustment between it and the Bank. (ECF No. 13, ¶ 31). Restructuring discussions were delayed and Plaintiffs struggled to obtain enough money to plant their crops in the spring of 2016. (ECF No. 13, ¶¶ 33–35). The Bank subsequently put the Kimmel Brothers on an interest-only repayment plan and, even so, the loan became delinquent with the Agency in April of 2017. (ECF No. 13, ¶¶ 36–37).

In the spring of 2017, Glasser, Chief Executive Director of the Agency in Indiana County, allegedly made it difficult for Plaintiffs to pursue a crop insurance claim. (ECF No. 13, ¶¶ 8, 38). Shortly after, David Kimmel was run over and trampled by a bull, which resulted in a broken neck and his inability to continue working on the farm. (ECF No. 13, ¶ 39). Because David Kimmel could no longer help on the Farm, Plaintiffs submitted a renewed restructuring plan. (ECF No. 13, ¶ 40). Poorbaugh, however, informed Plaintiffs that their plan was "non-cash flowable" and that they should proceed to file for bankruptcy. (ECF No. 13, ¶ 41). Plaintiffs thereafter sought to

obtain a mediation between the Agency and the Bank to discuss possible restructuring avenues. (ECF No. 13, ¶ 42).  In 2018, Plaintiffs' loan with the Bank became delinquent.

In October of 2018, Plaintiffs brought their plans to Krystal Pizarchik ("Pizarchik"), an Agency loan officer, for her to "load into [the system]."  (ECF No. 13, ¶ 44).  She allegedly informed Plaintiff that Poorbaugh "had put the purchase plan under water in excess of $300,000." (ECF No. 13, ¶ 45).  Thereafter, David Kimmel and Pizarchik found "numerous typographical errors, mistakes[,] and fraudulent numbers [that made the plan] not cash flow."  (ECF No. 13, ¶ 46).  After fixing the errors, the plan "did cash flow[]" (ECF No. 13, ¶ 47), and after making Poorbaugh aware of the fixes, Poorbaugh expressed his unhappiness with Plaintiffs.  (ECF No. 13, ¶ 48).  The requested mediation between the parties did not occur and the plan, which included the Bank restructuring the debt with the Agency's guarantors, was eventually denied.  (ECF No. 13, ¶¶ 49–50).  One year later, however, Plaintiffs obtained a mediation with Poorbaugh to create a new restructuring plan, but that plan put them "in excess of $600,000 'underwater.'"  (ECF No. 13, ¶ 52).  Poorbaugh's plan allegedly "fail[ed] to 'cash flow[]' [because it] took income off grains, did not change expenses[,] and used the Kimmel Brothers['] average number which was inaccurately put in a negative light."  (ECF No. 13, ¶¶ 52–53).

In March of 2019, the Bank levied on the milk checks of Plaintiffs.  (ECF No. 13, ¶ 54). The next month, the Indiana County Sheriff's Department levied on the Farm's cattle and equipment.  (ECF No. 13, ¶ 55).  The Kimmel Brothers had a meeting with Gary Groves, State Executive Director of the Agency, in which they requested a meeting between the Agency and the Bank to discuss their current situation.  (ECF No. 13, ¶ 56).  Around the same time, Glasser began contacting the Sheriff's Department in an effort to have the Farm levied.  (ECF No. 13, ¶ 57). Plaintiff again called Ray Sleppy to set up a meeting between themselves and the Bank to discuss

the current situation.  (ECF No. 13, ¶ 58).  Ray Sleppy "seemed to be very open to [that] in order to remedy Plaintiffs' financial situation."  (ECF No. 13, ¶ 59).  David Kimmel contacted Gary Groves to advise him of an upcoming meeting with Ray Sleppy.  (ECF No. 13, ¶ 60).  Glasser visited the Farm and complained to Plaintiffs that "he had been 'thrown under the bus' after comments were made about his rushing the Sheriff to levy . . . Plaintiffs['] cattle, equipment[,] and farm."  (ECF No. 13, ¶ 61).  David Kimmel informed Glasser that, later the same morning, a meeting had been arranged with the Bank.  Shortly after departing the Farm, David Kimmel received a text message from Ray Sleppy cancelling the meeting and any future communication.  (ECF No. 13, ¶ 65).  Plaintiffs then called Gary Groves to inform him that the meeting with the Bank had been cancelled, and Gary Groves was surprised because he allegedly had not spoken with Glasser or the Bank.  (ECF No. 13, ¶¶ 68–69).

In June of 2019, the Farm's cattle and equipment were sold at a sheriff's sale.  (ECF No. 13, ¶ 70).  Although, in Plaintiffs' experience, the highest price for cattle was usually received when the cattle are sold individually or in small lots, the Bank "credit bid the cattle at $165,000 for the entire lot of cattle . . . ."  (ECF No. 13, ¶ 73).  The Bank allegedly entered into a prearranged agreement for Jake Dressler to purchase the cattle in their entirety, and Jake Dressler subsequently did so.  (ECF No. 13, ¶¶ 75–76).

## II.    STANDARDS OF REVIEW

### A.    Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss filed pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  A plaintiff must allege sufficient facts that, if accepted as true, state a claim for relief that is plausible on its face.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court must

5

accept all well-pleaded factual allegations as true and view them in the light most favorable to a plaintiff. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Although this Court must accept the allegations in the Complaint as true, it is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations omitted).

The "plausibility" standard required for a complaint to survive a motion to dismiss is not akin to a "probability" requirement but asks for more than sheer "possibility." *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 556). In other words, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations are true even if doubtful in fact. *Twombly*, 550 U.S. at 555. Facial plausibility is present when a plaintiff pleads factual content that allows the court to draw the reasonable inference that a defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Even if the complaint's well-pleaded facts give rise to a plausible inference, that inference alone will not entitle a plaintiff to relief. *Id.* at 682. The complaint must support the inference with facts to plausibly justify that inferential leap. *Id.*

Generally, a court may not consider an extraneous document when reviewing a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). If matters outside the pleadings are presented to, and not excluded by, the court, the motion must be converted to a motion for summary judgment. Fed. R. Civ. P. 12(d). When reviewing the sufficiency of a complaint, however, a court may consider attachments to it without converting the motion into one for summary judgment as long as they are integral to the allegations in the complaint and are indisputably authentic. *Fallon v. Mercy Catholic Med. Ctr. of Se. Penn.*, 877

F.3d 487, 493 (3d Cir. 2017) (same); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

**B.      Federal Rule of Civil Procedure 12(b)(1)**

Under Rule 12(b)(1), a court must grant a motion to dismiss if there is a lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A plaintiff bears the burden of persuasion that federal jurisdiction is present. *Saint Vincent Health Ctr. v. Shalala*, 937 F. Supp. 496, 501 (W.D. Pa. 1995) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)). The threshold to survive a motion to dismiss under Rule 12(b)(1) is lower than that under Rule 12(b)(6). *Lunderstadt v. Colafella*, 886 F.2d 66, 70 (3d Cir. 1989). This is because dismissal for lack of jurisdiction cannot be predicated on the mere probability that a plaintiff's legal theories are false; a court will only dismiss for a lack of jurisdiction if a plaintiff's legal theories 1) are solely proffered to obtain federal jurisdiction but otherwise are immaterial, or 2) are "insubstantial on their face." *Growth Horizons, Inc. v. Del. Cnty., Pa.*, 983 F.2d 1277, 1280 (3d Cir. 1993) (quoting *Bell v. Hood*, 327 U.S. 678, 773, 776 (1946)).

**III.   ANALYSIS**

**A.      The United States' Motion for Substitution**

The United States requests that the Court substitute it for Glasser with regard to Count IV of the Amended Complaint because the Attorney General of the United States, by the United States Attorney for the Western District of Pennsylvania, certified that Glasser was acting within the scope of his employment with the Department of Agriculture at the time of the actions giving rise to this case. (ECF No. 18, p. 2).

"The Federal Employees Liability Reform and Tort Compensation Act of 1988 'accords federal employees absolute immunity from common-law tort claims arising out of acts they

undertake in the course of their official duties.'" *Young v. Temple University Hospital*, No. 19-1174, 2019 WL 5569510, at *3 (E.D. Pa. Oct. 28, 2019) (quoting *Osborn v. Haley*, 549 U.S. 225, 229 (2007)). "Therefore, where an action is brought against an employee of the United States that arose from the employee's actions or omissions within the scope of his office or employment, the United States should be substituted as the defendant against whom the plaintiff may proceed." *Id.* (citing 28 U.S.C. § 2679(d)). The United States Attorney General may certify that the defendant was acting within the scope of his office or employment at the time of the incident out of which the claim arose. 28 U.S.C. § 2679(d)(1). If he does so, any action brought in a district court shall be deemed an action against the United States, and the United States shall be substituted as the party-defendant. *Id. See also* 28 C.F.R. § 15.4(a) (authorizing the United States Attorney for the district in which the action is brought to statutorily certify that the employee at issue was acting within the scope of his employment). "Following certification that a federal employee sued for a common law tort was acting within the scope of his employment, 'the employee is dismissed from the action, and the United States is substituted as defendant in place of the employee.'" *Young*, 2019 WL 5569510, at *4 (citing *Osborn*, 549 U.S. at 230).

"Certification by the United States Attorney General or United States Attorney 'is *prima facie* evidence that the employee's challenged conduct occurred within the scope of employment.'" *Id.* (quoting *Melo v. Hafer*, 13 F.3d 736, 742 (3d Cir. 1994)). "[C]ertification, however, is rebuttable and subject to judicial review." *Id.* (citing *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 435–36 (1995)). "If a plaintiff disputes the veracity of a certification, 'the burden then shifts to the plaintiff, who must come forward with specific facts rebutting the certification.'" *Id.* (quoting *Schrob v. Catterson*, 967 F.2d 929, 936 (3d Cir. 1992)).

Because the United States Attorney General certified that Glasser was acting within the scope of his employment, the burden shifts to Plaintiffs to come forward with specific facts rebutting the certification.   Plaintiffs, however, do not point out specific facts to rebut the certification, but instead argue that the factual circumstances—namely those pertinent to the elements of intentional interference—contained in the Amended Complaint sufficiently establish that the conduct at issue was outside the scope of employment, and that discovery is otherwise needed on the issue.   Plaintiffs' failure to identify any specific factual circumstances surrounding Glasser's employment leaves the certification of the United States Attorney General unrebutted, and therefore, the Court grants the United States' Motion for Substitution (ECF No. 18) and substitutes the United States for Glasser.

**B.      The United States' Motion to Dismiss**

The United States first requests that the Court dismiss Count IV of the Amended Complaint against Glasser on the grounds that the Court lacks subject matter jurisdiction because the Federal Tort Claims Act does not waive the United States' sovereign immunity for the tort of intentional interference with a contractual relationship, and because Plaintiffs did not file an administrative claim prior to commencing suit.   (ECF No. 20, p. 1).

"As a sovereign, the United States is immune from suit unless it consents to be sued." *Adams v. U.S.*, No. 12-1178, 2013 WL 4666329, at *4 (W.D. Pa. Aug. 30, 2013) (citing *U.S. v. Sherwood*, 312 U.S. 584, 586 (1941)).   "The Federal Tort Claims Act waives the United States' sovereign immunity for certain torts committed by federal employees or an agency." *Id.* (citing 28 U.S.C. § 2674).   "But that waiver contains numerous exceptions, including '[a]ny claim arising out of . . . interference with contract rights." *Id.* (quoting 28 U.S.C. § 2680(h)).

Plaintiffs do not argue that the Agency is not a federal agency as defined by the Federal Tort Claims Act, nor do they present any argument outside of those arguments already set forth in their opposition to the United States' Motion for Substitution. As a result, because Plaintiffs' claim alleges intentional interference with a contractual relationship against Glasser, it is not permitted under the Federal Tort Claims Act. Therefore, the Court grants the United States' Motion to Dismiss Count IV of the Amended Complaint for intentional interference with a contractual relationship for lack of subject matter jurisdiction. *See Trico Development Associates L.P. v. O.C.E.A.N., Inc.*, No. 10-2847, 2010 WL 3614214, at *4 (D.N.J. Sep. 8, 2010) (dismissing intentional interference with contract claims because they were not permitted under the FTCA); *Adams*, 2013 WL 4666329, at *4 (finding that Defense Finance and Accounting Service was a federal agency, and dismissing intentional interference claim).

The United States also requests that the Court dismiss Count III of the Amended Complaint against the Agency and Poorbaugh on the grounds that Plaintiffs have not alleged facts consistent with a violation of 15 U.S.C. § 1679b(a)(2)(B)(ii) of the Credit Repair Organizations Act. (ECF No. 20, p. 2). The United States argues, *inter alia*, that Count III of the Amended Complaint brought under the Credit Repair Organizations Act must be dismissed because the case does not concern or implicate credit repair organizations. (ECF No. 21, p. 9).

§ 1679b(a)(2) provides that:

No person may—

. . . .

(2) make any statement, or counsel or advise any consumer to make any statement, the intended effect of which is to alter the consumer's identification to prevent the display of the consumer's credit record, history, or rating for the purpose of concealing adverse information that is accurate and not obsolete to--

(A) any consumer reporting agency;

(B) any person--

(i) who has extended credit to the consumer; or

(ii) to whom the consumer has applied or is applying for an extension of credit

15 U.S.C. § 1679b(a)(2).

The term "consumer reporting agency" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f).  Credit repair organizations are statutorily defined under 15 U.S.C.

§ 1679a(3):

The term "credit repair organization"--

(A) means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of--

(i) improving any consumer's credit record, credit history, or credit rating; or

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i); and

(B) does not include--

(i) any nonprofit organization which is exempt from taxation under section 501(c)(3) of Title 26;

(ii) any creditor (as defined in section 1602 of this title), with respect to any consumer, to the extent the creditor is assisting the consumer to restructure any debt owed by the consumer to the creditor; or

(iii) any depository institution (as that term is defined in section 1813 of Title 12) or any Federal or State credit union (as those terms are defined in section 1752 of Title 12), or any affiliate or subsidiary of such a depository institution or credit union.

Whether § 1679b requires that a plaintiff plead the existence and involvement of a credit repair organization is an unsettled question within the Third Circuit. *Compare Perry v. Drivehere.com, Inc.*, No. 11-2429, 2011 WL 3204818, at \*2–3 (E.D. Pa. Jul. 28, 2011) (analyzing whether defendant-company fell within the statutory definition of a credit repair organization); *Cann v. Kanauss*, No. 10-0921, 2010 WL 11561093, at \*3 (E.D. Pa. Sep. 30, 2010), *vacated in part on other grounds*, No. 10-0921, 2010 WL 11561093 (E.D. Pa. Sep. 30, 2010) ("To state a claim under 15 U.S.C. § 1679, a plaintiff must first allege facts sufficient to show that the defendant can be deemed a 'credit repair organization' for the purposes of the statute."); *and Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 403 (2006) (discerning whether defendants were credit repair organizations after they argued that they did not fall within the statutory definition of the same); *with Poskin v. TD Banknorth, N.A.*, 687 F. Supp. 2d 530, 542–44 (2009) (finding that because Congress used "both the terms 'person' and 'credit repair organization' in § 1679b, . . . the terms are not . . . interchangeably read[,]" and allowing the claim to proceed in the absence of a credit repair organization); *and Oslan v. Collection Bureau of Hudson Valley*, No. 01-2173, 2001 WL 34355648, at \*2 (E.D. Pa. Dec. 13, 2001) (stating that §§ 1679b(a)(3), (a)(4), and (b), are specific to credit repair organizations, while §§ 1679b(a)(1) and (a)(2) are not restricted to credit repair organizations). Because a decision rendered by a district court is nonprecedential, and where as here, district courts within the Third Circuit have come to different conclusions, the Court must conduct an independent analysis of the issues. *Threadgill v. Armstrong World Industries, Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991).

To determine whether § 1679b(a)(2) requires the existence and participation of a credit repair organization, the Court is aided by the longstanding canons of statutory interpretation. "The role of the courts in interpreting a statute is to give effect to Congress's intent." *In re Lord Abbett*

*Mutual Funds Fee Litigation*, 553 F.3d 248, 254 (3d Cir. 2009) (quoting *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001)) (internal quotation marks omitted). "The first step in statutory construction is to consider the plain language of the statute." *Id.* (citation omitted). "If the language of the statute expresses Congress's intent with sufficient precision, the inquiry ends there and the statute is enforced according to its terms." *Id.* (quoting *United States v. Gregg*, 226 F.3d 253, 257 (3d Cir. 2000)) (internal quotation marks omitted). "Where the statutory language does not express Congress's intent unequivocally, a court traditionally refers to the legislative history and the atmosphere in which the statute was enacted in an attempt to determine the congressional purpose." *Id.* (quoting *Gregg*, 226 F.3d at 257) (internal quotation marks omitted).

The plain language of § 1679b(a)(2) uses the term "person," and a strict reading of the section would indicate that *persons* are prohibited from engaging in the statutorily prohibited conduct. *In re Wright*, Bankruptcy No. 05-40829, 2007 WL 1459475, at *5 (N.D. Ala. May 16, 2007). 15 U.S.C. § 1679b(a)(1) similarly prohibits *persons* from making false or misleading statements about another's credit worthiness, credit standing, or credit capacity. 15 U.S.C. § 1679b(a)(1). *See also Wright*, 2007 WL 1459475, at *5. Thus, "[i]f read in the abstract, §§ 1679b(a)(1) and [(a)](2) . . . prohibit practices not *expressly* involving the services or activities of a credit repair organization." *Wright*, 2007 WL 1459475, at *5. Similarly, if these sections are read out of context, the "plain language appears to extend liability to any person who might be found guilty of committing one of the prohibited practices, regardless of whether the practice involved a credit repair organization." *Id.* at *11.

In *Wright*, the bankruptcy court proceeded through a thorough and well-reasoned analysis of § 1679b(a)(1)'s use of the term "person." *See Moret v. Select Portfolio Servicing, Inc.*, No. 08-61996, 2009 WL 1288062, at *3 (S.D. Fla. May 6, 2009) (describing *Wright's* analysis as

thorough). Despite the above, after embarking on a detailed, thorough, and exhaustive analysis of cases discussing the provisions of § 1679b, as well as both the purpose and legislative history of the Credit Repair Organizations Act, the court found that extending the scope of § 1679b(a)(1) to include the conduct of persons in the absence of a credit repair organization (i.e., examining it as a stand-alone statute) would be inconsistent with "the context of the entire Act, including its codified findings and purposes . . . ." *Wright*, 2007 WL 1459475, at *11. The *Wright* court stated:

> Section 1679b(a)(1) should be construed within the context of the entire Act, including its codified findings and purposes, not as if § 1679b(a)(1) were a stand-alone statute. When it enacted CROA, the focus of Congress was on the credit repair industry, not enacting a federal cause of action creating liability for every person guilty of making defamatory statements about a consumer's creditworthiness. Remedies for such wrongs are adequately provided for under state tort laws. This Court cannot assume Congress intended to add a federal question cause of action to the dockets of federal courts without some mention of its reasons for doing so in the codified findings and purposes or in the Act's legislative history. The congressional findings, purposes and history only discuss the credit repair industry, nothing more.

*Id.* The *Wright* court accordingly held that "liability under [Credit Repair Organizations Act] is limited to credit repair organizations as defined in § 1679a(3), and persons who are not credit repair organizations but nonetheless are guilty of the practices prohibited by § 1679b(a)(1) in connection with the activities of, or transactions involving a credit repair organization." *Id.* An opposing interpretation would not serve the purposes of the Credit Repair Organizations Act. *Id.*

The *Wright* court's well-reasoned analysis declining to extend § 1679b(a)(1) to encompass the conduct of all persons generally applies equally to the purview of § 1679b(a)(2) because § 1679b(a)(2) similarly employs the term person. The Court agrees with *Wright's* analysis, and therefore holds that a suit brought under § 1679b(a)(2) must include the conduct of a credit repair organization, or conduct connected with the activities of, or transactions involving a credit repair organization. The court in *Hernandez v. Saybrook Buick GMC, Inc.*, No. 20-438, 2020 WL

7137417, at *9 (D. Conn. Dec. 4, 2020), in addition to serving as an instructive guidepost, aptly summarized cases that have embraced a similar view. *See  Lopez v. ML # 3*, 607 F.Supp.2d 1310, 1314 (N.D. Fla. 2009) ("In sum, when the Act is considered as a whole and in light of its explicitly stated purposes, it is clear that it applies only in the credit-repair context."); *Berry v. Cook Motor Cars, Ltd.*, No. 09-426, 2009 WL 1971391, at *2 (D. Md. Jun. 29, 2009) ("This court agrees with the analysis in *In re Wright*."); *Karakus v. Wells Fargo Bank*, 941 F. Supp. 2d 318, 338 (E.D.N.Y. Apr. 22, 2013) ("Although some authority exists for the ... proposition that 'no person' should be read broadly enough to include mortgage lenders like Wells Fargo, this interpretation would run afoul of the purposes the statute was designed to achieve."); *Moret*, 2009 WL 1288062, at *3 ("The Court agrees with the Defendants that [the Credit Repair Organizations Act] was not intended to apply where no credit repair organizations, as defined by the Act, was involved."); *Rautu v. U.S. Bank, N.A.*, No. 12-12961, 2013 WL 866480, at *6 (E.D. Mich. Mar. 7, 2013) (analyzing § 1679b(a)(1) in the context of the statute as a whole and concluding that "[i]nterpreting § 1679b as applicable to persons not affiliated with credit repair organizations would expand the scope of the statute beyond its stated purpose"); *In re: Experian Info. Solutions, Inc.*, No. 15-01212, 2017 WL 3574847, at *4 (D. Ariz. Aug. 17, 2017) ("[I]t is clear from the text and structure of the CROA that the 'persons' whose conduct the CROA regulates are credit repair organizations or persons associated with credit repair organizations.").

Turning to the matter at hand, the Bank is not a credit repair organization because it is expressly exempted as such under 15 U.S.C. § 1679a(3)(B)(iii). *Schnell v. Bank of New York Mellon*, 828 F. Supp. 2d 798, 808 (E.D. Pa. 2011). The Amended Complaint contains only a single, conclusory sentence alleging that the Agency is a "credit repair organization." (ECF No. 13, ¶ 93). The Court, however, is "not compelled to accept [an] unsupported conclusion[] . . . or

a legal conclusion couched as a factual allegation." *Baraka*, 481 F.3d at 195.   The Agency's

website[1] provides:

> Today, [the Agency's] responsibilities are organized into five areas: Farm
> Programs, Farm Loans, Commodity Operations, Management and State
> Operations. The agency continues to provide America's farmers with a strong safety
> net through the administration of farm commodity programs. FSA also implements
> ad hoc disaster programs. FSA's long-standing tradition of conserving the nation's
> natural resources continues through the Conservation Reserve Program. The
> agency provides credit to agricultural producers who are unable to receive private,
> commercial credit. FSA places special emphasis on providing loans to beginning,
> minority and women farmers and ranchers. Its Commodity Operations division
> purchases and delivers commodities for use in humanitarian programs at home and
> abroad. FSA programs help feed America's school children and hungry people
> around the globe. Additionally, the agency supports the nation's disabled citizens
> by purchasing products made by these persons.

UNITED STATES DEPARTMENT OF AGRICULTURE, HISTORY OF USDA'S FARM SERVICE AGENCY,

https://www.fsa.usda.gov/about-fsa/history-and-mission/agency-history/index (last visited Feb. 3,

2021).   The Agency oversees several agricultural support programs, including the Guaranteed

Farm Loan Program. *Food & Water Watch v. United States Dept. of Agriculture*, 325 F. Supp. 3d

39, 44 (D.D.C. 2018) (citation omitted).

> Under this program, a borrower can apply to have the FSA guarantee a percentage
> of a loan made by a qualified agricultural lender for purposes including acquiring
> or enlarging a farm; making capital improvements, such as the construction,
> purchase, and improvement of a farm dwelling, service buildings and facilities that
> can be made fixtures to the real estate; promoting soil and water conservation and
> protection; paying closing costs; and refinancing indebtedness incurred for
> authorized farm ownership loan and operating loan purposes.   7 C.F.R. §§
> 762.121(b)(1)–(5).

---

[1] Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the United States
Department of Agriculture's website. *See Napold v. Parvatishver, LLC*, No. 17-584, 2018 WL
1089680, at *6 n.1 (W.D. Pa. Feb. 28, 2018) (taking judicial notice of government website);
*Landair Transport, Inc. v. Del's Truck and Auto Repair*, No. 17-0723, 2018 WL 950208, at *2 n.1
(M.D. Pa. Feb. 20, 2018) (same); *United States v. Davis*, No. 15-379, 2020 WL 4193021, at *1 n.2
(E.D. Pa. Jul. 21, 2020) (same); *Konetsco v. Lancaster Cty. – Bureau of Collections*, No. 19-5095,
at *4 n.5 (same); *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 258–59 (E.D. Pa. 2020)
(same).

*Id.* (cleaned up). "As part of their application for a[] . . . loan guarantee, borrowers must certify that they are 'unable to obtain sufficient credit elsewhere without a guarantee to finance actual needs at reasonable rates and terms.'" *Id.* at 45 (quoting 7 C.F.R. § 762.120(h)(1)). "Once the [Agency] has guaranteed a loan, lenders are responsible for servicing the entire loan in a reasonable and prudent manner, protecting and accounting for the collateral, and remaining the mortgagee or secured party of record." *Id.* (quoting 7 C.F.R. § 762.140(a)(1)) (cleaned up). "Lenders must also ensure the borrower is in compliance with all laws and regulations applicable to the loan, the collateral, and the operations of the farm." *Id.* (quoting 7 C.F.R. § 762.140(b)(3)) (cleaned up).

Neither the Agency nor the Guaranteed Farm Loan Program, encompass the activities of or transactions involving a credit repair organization. Rather, the Agency and the Guaranteed Farm Loan Program provide farming borrowers that are unable to obtain credit in the normal course with credit for the purposes listed in §§ 762.121(b)(1)–(5). Therefore, because this case does not concern the conduct of a credit repair organization, or conduct connected with the activities of, or transactions involving a credit repair organization, the Court grants the United States' Motion to Dismiss Count III of the Amended Complaint.

IV.    **CONCLUSION**

For the reasons set forth above, the Court grants the United States' Motion for Substitution (ECF No. 18) and substitutes the United States for Glasser because Plaintiffs failed to point to specific factual circumstances rebutting the certification of the United States Attorney General. The Court grants the United States' Motion to Dismiss (ECF No. 20) Counts III and IV of the Amended Complaint against the Agency, Poorbaugh, and Glasser. The Court does not have subject matter jurisdiction over Count IV for intentional interference with a contractual relationship because the United States has not waived its sovereign immunity under the Federal

Tort Claims Act.  The Court also grants the United States' Motion to Dismiss Count III for an alleged violation of 15 U.S.C. § 1679b(a)(2)(B)(ii) because Plaintiffs have not alleged that the conduct of a credit repair organization, or conduct connected with the activities of, or transactions involving a credit repair organization are at issue.  The Court denies the Bank's Motion to Dismiss (ECF No. 15) as moot because it lacks subject matter jurisdiction over the remaining state law causes of action at Counts I and II.  Counts I and II are dismissed without prejudice and the case is remanded to the Court of Common Pleas of Indiana County, Pennsylvania, for further proceedings.  An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

February 9, 2021
Dated